UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF                                    CASE NUMBER

**BILLY D. MCCOLLUM**                              **05-13697**
                                                   **SECTION A**

                                                   CHAPTER 13

<u>**REASONS FOR DECISION**</u>

On November 12, 2005, Billy D. McCollum, ("Debtor") filed a Motion For Permission To Sell Property Of Estate ("Motion").  The Motion requests authority to sell Debtor's home for $37,000.00.  Since the property is unencumbered, Debtor is asserting the homestead exemption over the first $25,000.00 in net proceeds from the sale.  Debtor proposes to pay the remaining proceeds, estimated to be $12,000.00, to claimants as an accelerated lump sum payment of the amounts due under his plan.  He further alleges that this will complete his obligations under the plan and asks for judicial recognition of same.

Mr. S. J. Beaulieu, the Chapter 13 trustee for this district, ("Trustee") has objected to the relief requested on multiple grounds.  First, Trustee argues that the proceeds of the sale are property of the estate subject to the claims of creditors or alternatively, disposable income.  Specifically, Trustee objects to the application of Debtor's homestead exemption to the proceeds.   In so doing, Trustee has questioned the correctness of this Court's ruling in *In re Dupre, case no. 03-14318,* which upheld the application of the homestead exemption to the proceeds of a voluntary sale, post confirmation.

1

Trustee also objects to the early buyout of Debtor's plan. Because only 6 months of payments have been made under Debtor's plan and the residual proceeds will be insufficient to fully satisfy claims held against the Debtor, Trustee argues that the Debtor must continue to make payments under his plan. Specifically, Trustee argues that an early buyout will violate 11 U.S.C. §§1325(b) and 1329 since Debtor will not have made at least 36 monthly payments on his plan, and the claims have not been fully satisfied.

No other parties objected to the Motion. Both Debtor and Trustee were given an opportunity to brief the issues presented and to offer evidence in support of their positions. The following facts are not in dispute.

Debtor filed a voluntary petition for relief under Title 11, Chapter 13 on May 5, 2005. His plan was confirmed on July 12, 2005. Under the terms of the plan, Debtor committed to make monthly payments of $138.00 for a period of 54 months. From these payments, administrative expenses of $1,400.00, Trustee's commissions, and unsecured debts were to be paid. Unsecured, allowed claims total $13,631.47.

The only asset listed on Debtor's schedules at the time of confirmation was his home valued at $30,000.00. Debtor claimed a homestead exemption on the property. Neither the property's value nor the claimed exemption were challenged prior to confirmation. Debtor is 67 years old and his only source of income is from social security.

2

## I.  The Applicability of The Homestead Exemption To The Proceeds Of A Voluntary Sale

The analysis of this case begins with a review of the reasoning in *Dupre* regarding the applicability of the Louisiana homestead exemption to the proceeds of a voluntary, post petition sale. Trustee asserts that the reasoning in *Dupre* is erroneous and has referred the Court to the decisions of *Schexnailder v. Fontenot*, 85 So. 207 (La. 1920), and *Murff v. Ratcliff*, 19 La. App. 109 (2nd Cir. 1932) in support of his position.[1]

11 U.S.C. §522 exempts certain property of the debtor from distribution to claimants. The purpose of the statute is to provide the debtor with minimal assets with which to begin life once relieved from the burdens of pre-petition debt. These assets have been legislatively selected in an effort to provide subsistence. The public policy behind the granting of exemptions is to avoid the debtor or his family becoming a burden on the state. As such, exempt assets have been deemed by Congress as crucial to the debtor's fresh start. *In re Butcher*, 189 B.R. 357 (Bankr.D.Md.1995), *aff'd* 125 F.3d 238 (4th Cir.1997); *In re Wright*, 156 B.R. 549 (Bankr.N.D.Ill.1992); *In re Johnson*, 57 B.R. 635 (Bankr.N.D.Ill.1986); *In re Dipalma*, 24 B.R. 385 (Bankr.D.Mass.1982).

The Bankruptcy Code contains two options, or schemes, for identifying property which is exempt. The first is a federal list contained in §522 itself. The second allows, at the option of a state, the adoption of state law exemptions. Louisiana has elected to utilize state law exemptions rather than those provided by the Bankruptcy Code. La. R.S. 13:3881(B)(1). As a result, Louisiana law controls the property upon which an exemption may be claimed.

---

[1] The Trustee also cited in his Supplemental Brief the case of *Pizzolato v. Fontenot*, 147 La. 601, 85 So. 605 (La. 1920). In *Pizzolato*, the issue was not whether the homestead exemption applied to the proceeds of a sale, but whether a simulated sale deprived the owner of the homestead exemption.

3

The Louisiana homestead exemption is created under the Louisiana Constitution, Art. XII §9. La. R.S. 20:1 (A) also provides an exemption against seizure or sale of a residence occupied by the owner of the land on which the residence is located up to a value of $25,000.00.

The question presented in *Dupre*, as in this case, was whether or not the exemption applied to the proceeds of a voluntary sale of property. The disagreement between the parties is as a result of divergent interpretations of La. R.S. 20:1 (D). That subpart provides that the right to voluntarily sell a homestead "*shall be preserved but no sale shall destroy or impair any rights of creditors thereon.*" It is the interpretation of the second clause of the statute that creates controversy.

No cases discussing the applicability of the homestead exemption to the proceeds of voluntary sales could be found, and therefore an analysis of the principles contained in analogous fact patterns have been examined.

The analysis begins by looking to the Louisiana courts' interpretation of their own exemption statutes for guidance in application. Louisiana courts dictate that exemption laws are to be liberally construed in favor of the debtor. *Young v. Geter*, 170 So. 240 (La. 1936); *Fant v. Miller*, 170 So. 412 (La. App. 1936); *Laurencic v. Jones*, 180 So.2d 803 (La. App. 4th Cir. 1965); and *Mounger v. Ferrell*, 11 So.2d 56 (La. App. 2d Cir. 1942). In construction of exemption laws, the intention of lawmakers must be discovered, carried out, and given broad and liberal interpretation conductive to the purpose of the exemption. *Young, supra.* The purpose underlying all exemption legislation is the securing to the unfortunate debtor the means to support himself and his family, the protection of the family being the main consideration. *Mounger, supra.* Statutes of exemption are to be liberally construed in favor of the debtor in order to protect debtors and their families from financial destitution and to protect the public from the necessity of providing for them as public charges.

4

*Laurencic, supra.* The Louisiana Supreme Court decision of *Thompson-Richie & Co. v. Graves*, 120 So. 634 (La. 1936), is instructive on this point.

In *Thompson-Richie*, the Court held that the proceeds of insurance received in compensation for the loss of a homestead and its contents due to fire were entitled to protection from seizure. In its holding, the Supreme Court emphasized that the insurance proceeds delivered on the loss of the homestead were in every sense a substitute for the asset itself. As a result, to allow the seizure of those funds would by "mere technical evasion, pervert" the purpose of the statute.

Based on the rationale contained in *Thompson-Richie,* the proceeds derived from a sale would also be exempt. In *Dupre* a liberal construction of the exemption laws, coupled with the public policy behind their enactment and the rationale expressed in *Thompson-Richie*, led to the conclusion that the exemption attached to the proceeds of sale.

Trustee believes that an important distinction may be made between the facts of *Thompson-Richie* and this case. Specifically, Trustee argues that since this sale is voluntary, subpart (D) is relevant and warrants a different result. Subpart (D), while relevant to the discussion, does not warrant a contrary finding. In interpreting the directive that no voluntary sale "shall destroy or impair any rights of creditors [on the homestead]" a review of what rights creditors hold over property claimed as a homestead is appropriate.

Under Louisiana law, creditors have the right to seize and sell all but that portion of the homestead subject to a value of $25,000.00. Thus, the plain meaning of the statute allows for the voluntary sale of property, so long as the sale does not otherwise impair or destroy the rights of creditors to the property itself. Put into practical application, the statute prohibits a homeowner from forcing the cancellation of an undersecured lien against the homestead on a voluntary sale. *Dupre*

5

held that subpart D did not waive the homeowner's right to the exemption in the first instance nor the application of the exemption to the proceeds received on sale. Since the creditor's rights are defined by subpart A of the statute, subpart D provides that the rights given in subpart A be *maintained*, on a voluntary sale. The subpart does not provide that the creditor's rights should be *expanded*.

Trustee disagrees with this interpretation and in support of this most recent challenge, cites cases not previously briefed by the parties in *Dupre*. Trustee believes that the decisions of *Schexnailder* and *Murff* modify the ruling of *Thompson-Richie* and limit its application to instances of involuntary loss. If that were the case, it might cause this Court to revise its rationale in *Dupre*.

In *Schexnailder v. Fontenot, supra*, the Louisiana Supreme Court considered a request to enjoin the seizure of property subject to a judicial lien on the basis of a prior bankruptcy discharge. The plaintiff argued that as a result of the discharge, the judicial lien against his property had been canceled. The Louisiana Supreme Court had little difficulty in finding that the judicial lien survived the discharge and that the obligation continued *in rem* against the property. This is in accord with bankruptcy jurisprudence.

Specifically noted in the *Schexnailder* decision was the fact that the plaintiff had not claimed freedom from the lien based on the homestead exemption. Instead, plaintiff's entire argument was dependent on the effects of his prior bankruptcy discharge. *Therefore neither the application of the homestead exemption to the proceeds of sale or even the property post discharge was at issue. Schexnailder, supra*, at 471. Nevertheless, Trustee believes that the case is persuasive on the issue of the applicability of the exemption to the proceeds of a voluntary sale. Trustee refers the Court to language contained in the opinion which he asserts addresses the question before the Court.

6

The *Schexnailder* Court posits, *in dicta,* a hypothetical that if the plaintiff had chosen to sell the property, the conditions to support the homestead exemption would cease and therefore the judgment creditor *could immediately seize the property to satisfy his claim. Schexnailder, supra,* at 472. This interpretation of the law is correct, and in fact adopted in the *Dupre* decision. *Dupre* held that the provisions of La. R. S. 20:1 (D) were to protect the judicial lien holder from an involuntary cancellation of the lien on a voluntary sale without full payment. Under Louisiana law, only upon a sale conducted under judicial process could the lien be involuntarily removed for less than full payment.[2] However, the fact that the judicial lien survives the voluntary sale, does not address the question of whether or not the proceeds of the sale, in the hands of the judgment debtor, are subject to seizure.

Similarly in *Murff v. Ratcliff, supra*, the Louisiana Second Circuit Court of Appeal confirmed that a judicial lien continues to encumber the homestead upon its transfer by voluntary sale. In both of these cases the Courts confirmed that upon sale, the conditions giving rise to the exemption would necessarily cease and therefore *the property* would be available to satisfy the judgment.[3]

-----

[2] In fact, a very plausible argument may be made that precisely because the exemption protects the proceeds of sale, the lien survives against the property, the proceeds being beyond the creditors' reach.

[3] Under Louisiana law there are limited mechanisms for the elimination of liens against property. On an involuntary sale, the sheriff is authorized after public auction, to issue a *proces vebal* and sheriff's deed transferring the property free and clear of liens and encumbrances. Nevertheless, in the case of a public auction, even though the subordinate lien may be cancelled by the sale, Louisiana law recognizes the right of the debtor to collect up to $25,000.00 from the proceeds of sale. *Citizen's Finance Discount Service of Baton Rouge, Inc. v. Hollier*, 432 So.2d 412 (La. App. 1st Cir. 1983). Similarly, in bankruptcy, debtors may strip certain liens that impair their exemption, other than one obtained by consent or to secure a purchase money obligation. 11 U.S.C. §522(f). In each case the supervision of a court is available to the claimants, protecting the value of the property and providing a forum for challenge to the creditors.
In this case, there are no liens against the property. Trustee asserts only rights held by

7

Trustee believes that under this reasoning, the proceeds should also be subject to claims of the estate because the proceeds of sale do not satisfy the conditions of the exemption. Trustee argues that "The homestead exemption protects debtor's residence from seizures and sales and does not apply to proceeds from the voluntary sale of property." But Trustee's assertion is not entirely accurate. Read literally, the exemption is only from seizures and sales under judicial process.[4] Nothing specifically in the exemption protects the property from loss whether voluntary or involuntary, nor does it address proceeds.

Under the Louisiana Constitutions of 1913, 1921 and 1975, a portion of the value in a homestead was protected from *seizure* by creditors. To assert the exemption the debtor was required to own the land that the residence was located upon and to live in the property. Nothing in any of these versions of the Constitution addressed the result when a condition necessary to support the exemption was lost. Nothing specifically protected the proceeds accruing from the property's liquidation. Therefore, if Trustee's position were correct, no justification for the *Thompson-Richie,* decision could exist. In fact, when *Thompson-Richie* was decided, a strict interpretation of the Constitution might have supported a holding that upon the loss of the conditions required to assert the homestead exemption, *whether voluntary or involuntary, and other than through seizure,* the

───────────

unsecured claimants. Potentially these could include the rights of a judicial lien creditor under §544, but given the provisions of §522(f), the lien could be avoided as impairing the homestead exemption.

[4] Under the laws of Louisiana, the sheriff may not seize or execute against property subject to exemption. However, La.R.S. 9:3168, 13:385, and C.C.P.art. 2252 *et. seq*. allow for the sale of a homestead to satisfy secured claims encumbering the property. Nevertheless these statutes also provide that the debtor may claim up to $25,000.00 from the proceeds of sale to the extent a homestead exemption is available.

8

exemption would be lost. In such a case, both the property and its proceeds would be subject to the claims of creditors.  But exemptions are not strictly construed, and *Thompson-Richie* specifically declined to take so narrow an interpretation of the statute.

As previously discussed, the Louisiana Supreme Court, in a decision delivered *after Schexnailder* and *Murff,* held that the exemption *did* apply to proceeds.  In a question acknowledged by the Court to be *res nova*, it reasoned:

> Since the homestead statutes are to be liberally construed to protect a homestead to which the debtor is justly entitled, funds realized from the insurance of exempt premises are themselves exempt, as they do not represent a mere personal indemnity, but the homestead itself, and the money takes the place of the property destroyed.

*Thompson-Richie, supra,* at 365.

The *Thompson-Richie* Court held that to avoid the exemption as to insurance proceeds after the loss of property would, "by mere technical evasion, pervert" the object and spirit of the statutes of exemption.   Instead, the Louisiana Supreme Court looked to the purpose of the statute and the public policy behind its enactment.   In so doing, the literal provisions of the exemption were expanded liberally to include the proceeds of an insurance policy because the proceeds were a substitute for the property itself.  Since the proceeds of a sale are quite literally the substitute for the property itself, no distinction in *Thompson-Richie* and this case exists.

As enunciated by both federal and Louisiana law, exemptions provide minimal subsistence for the debtor and his or her family following their discharge from debt.  The Louisiana homestead exemption, with a upper limit of $25,000.00, is basic indeed.  Few would argue that *any* person could obtain a residence in this district for such a sum.  Instead, it is more likely to serve as a down payment on a home within which the debtor and his or her family could live rather than a sum sufficient to purchase a home.  Given Louisiana's liberal interpretation of exemption laws, the

9

jurisprudence of the Louisiana courts and the reasoning contained therein, the intent and policy supporting the exemption is to provide protection for not only the asset, but its value on liquidation. To hold otherwise would be to invade the asset pool designed to provide the debtor with a fresh start. This interpretation is also supported by bankruptcy law.

Bankruptcy Rule 4003(b) insulates exemptions from objection if not made within the 30 day period following the conclusion of the §341(a) meeting of creditors. In both *Dupre* and this case, no one objected to the Debtor's claim of exemption. As a result, the exemption is conclusively due and can not be collaterally attacked. *Taylor v. Freeland & Kroz*, 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed. 2d 280 (1992). It is also well settled that even if the conditions that gave rise to the exemption cease post petition, the validity of the exemption is tested on the day the petition is filed. *Taylor, supra; Myers v. Matley*, 318 U.S. 622, 63 S.Ct. 780, 87 L.Ed. 1043 (1943); *White v. Stump*, 266 U.S. 310, 45 S.Ct. 103, 69 L.Ed.301 (1924); *In re Zibman*, 268 F.3d 298 (5th Cir. 2001); *In re Ruggles*, 210 B.R. 57, 59-60 (Bankr.D.Vt.1997); *In re Davis*, 167 B.R. 104, 107 (Bankr.S.D. Ohio 1994); and Lundin, Keith M., *Chapter 13 Bankruptcy*, 3d. Ed. §161.1 (2000 & Supp. 2004) (hereinafter *Lundin*). The matter is *res judicata* and the property is no longer subject to distribution to claimants or claims of Trustee.

## II. Exempt Property is Not Income Distributable To Claimants

Trustee's argument that exempt property may somehow constitute "disposable income" under the Code is also unpersuasive. The very notion that property exempt from distribution to creditors could somehow become available by re-characterizing it as disposable income, would eliminate the protections afforded by exemption statutes. Statutory construction requires that the entire Code be read as a whole such that every part is given effect. To adopt Trustee's position would be to write

10

out  protections afforded exempt assets under §522.

In order to qualify for relief under Chapter 13, a debtor must have a source of money sufficient to fund a plan.  11 U.S.C. §101(30).  "An individual with regular income" means an individual whose income is sufficiently stable and regular to make payments under a plan.  *Lundin*, *supra*, at 8-1.  "Income" is not defined by the Bankruptcy Code.  However, in confirming a plan, the Court must determine both that the debtor has regular income to support its implementation and that the debtor has committed disposable income for a period sufficient to satisfy the provisions of §1325(b).

"Disposable income" is defined as income received by the debtor which is not reasonably necessary for the maintenance or support of the debtor or his dependents.  11 U.S.C. §1325(b)(2).  Thus the definition of "disposable income" requires both an analysis of what constitutes income and what expenses are reasonably necessary.   Trustee argues that the proceeds of property are income and cites *Lundin, supra* at 164-3.   The liquidation of property is not income.  It is neither regular nor given in exchange for services or in lieu of compensation.  The proceeds of property may be distributable to creditors not because they are income, but because they may be  property of the estate to which Trustee and claimants are entitled to depend upon for the satisfaction of claims.

11 U.S.C. §1325(a) (4) requires that the value of payments made under a plan must be equal to or in excess of the value of property available to claimants under Chapter 7.  Thus, the total payments scheduled under a plan must be equal to the debtor's disposable income for the term of the

plan *and* the sum of the payments made or property distributed must, in aggregate, be equivalent to, or in excess of, the liquidation value of any *non-exempt* property the debtor retains under the plan.[5]

To the extent a debtor surrenders non-exempt property to the trustee, that property will be distributed to creditors. The Code contemplates the distribution of *property* something broader than just income.[6] Property is composed of both periodic payments and property offered by the debtor for distribution to claimants at the time of confirmation. The distribution of unretained, non-exempt assets in addition to periodic payments under a plan is a common occurrence. For example, most debtors in this district do not retain the right to keep the proceeds of lawsuits pending at confirmation. Instead, on the settlement or satisfaction of the suit, any funds received are distributed by the trustee to creditors as an extra distribution. In the case of an illiquid asset, the debtor may agree to turn over any value received on its liquidation to the trustee as part of the plan.[7]

As a result, when the liquidation value is calculated at confirmation, the value of the non-exempt property that is being turned over to the trustee is either excluded altogether because it is not being retained by the debtor, or included and then added to the aggregate total of plan payments and property being distributed. Either way, the value of the non-exempt asset is not a factor in the aggregate periodic payments the debtor must contribute in order to meet the best interests of creditors test.

---

[5] Exempt property is not considered in a liquidation analysis. Collier on Bankruptcy, ¶1325.05[2][d], 1325-19 (15th ed. rev'd).

[6] 11 U.S.C. §1325(a)(4).

[7] Pursuant to 11 U.S.C. §1302, chapter 13 trustees lack the authority to use or sell property of the estate. 11 U.S.C. §1303 reserves this right to debtors. As a result, in part and parcel of their plans, debtors in this district often liquidate property of the estate, typically lawsuits, succession interests, etc. and remit the net proceeds to the trustee as an extra distribution to creditors over and above plan payments.

However, in most chapter 13 cases, the debtor does bargain to retain some non-exempt assets in exchange for periodic payments of disposable income.  In such a case, the value of payments under the plan must be equal to or in excess of the value of the property retained.   Exempt assets are not included in this calculation because in a chapter 7 liquidation, they would not be available to satisfy the claims of creditors.[8]  Since exempt assets are eliminated from the best interests of creditors test, Trustee is attempting to "back door" their inclusion through the application of the disposable income test of §1325(b).

Trustee quotes *In re Gebo*, 290 B.R. 168 (Bankr. M.D. Fla. 2002), and *Lundin, supra* at 164-3 in support of the position that exempt property is to be included in the calculation of disposable income. A careful reading of *Gebo* does not support this position. In *Gebo*, the Court considered the relevancy of workmen's compensation benefits to the calculation of disposable income. An exemption had been claimed on the benefits which went unchallenged by the trustee.   At confirmation, the trustee complained that the debtor had not committed his entire disposable income to the satisfaction of claims.   In considering confirmation, the Court looked to the exempt and non-exempt assets retained, the amount of payments offered, and length of the plan to determine if the proposed plan met the best interests of creditors test.   The plan under consideration was for a period of 36 months and provided distributions on a fraction of the claims.   While the *Gebo* Court acknowledged the exempt nature of the workmen's compensation benefits, it opined:

> In applying the [disposable income] test, this Court does not compel a liquidation of a debtor's exempt property, but merely considers whether the debtor, who supposedly voluntarily submits his disposable income to fund a plan, should be permitted to retain very substantial properties as exempt and offer to pay under the plan to creditors over an extended period, i.e. 36 months, a fraction of their claims when devoting a portion of the exempt funds could satisfy in full all allowed claims by immediate payment.  To accept this proposition brings into question a debtor's "good faith" which is also a condition to the confirmation of a chapter 13 plan.

*Gebo* at 170.

---

[8]  *See,* footnote 5*, supra*

13

Thus *Gebo does not* stand for the proposition that exempt property must be included in a plan, quite the opposite. *Gebo* holds that while a debtor *may not be required* to include exempt property in its plan, its exclusion, when coupled with a minimal term plan and low distributions, may be considered a factor in any claim of bad faith under §1325(a)(3). The Court agrees with this analysis and will take into account on both requests for modification and early buyout, the total of property retained, the liquidation value of assets available at confirmation, and distributions available to claimants in assessing a debtor's good faith.

Trustee also cites *Lundin,* in further support of his position. *Lundin* does appear to sanction the inclusion of exempt property, as well as proceeds from the sale of property, in the definition of disposable income.[9] However, Trustee has neglected to include a citation to *Lundin*, *supra,* §161 which is also relevant to this discussion and modifies *Lundin's* general premise regarding income. In §161 *Lundin* argues:

> Exempt property can be an opportunity for the debtor with a best-interests of creditors test problem. Occasionally, Chapter 13 debtors have substantial assets that are exempt-for example, retirement accounts or the equity in a homestead. When there is nonexempt property in the estate that would be liquidated by a Chapter 7 trustee, the debtor has the option to voluntarily contribute exempt assets to make distributions to creditors sufficient to balance the assets that would be liquidated in a Chapter 7 case.

*Lundin*, *supra,* §161 at 161-1.

---

[9] *See Lundin, supra* §164 at 164-2.,

14

*Lundin* also recognizes the availability of exempt property as a source for accelerated payment under a confirmed plan. *Lundin, supra,* §263.1 at 263-3.  The provisions of *Lundin* appear circular[10] unless one parses the cases cited in the various sections of his treatise.

Under the section defining income, *Lundin* acknowledges that certain forms of exempt property may be included in the calculation of disposable income.  These exempt properties are generally streams of payments, social security, workmen's compensation, or disability payments as well as personal injury proceeds  for lost wages.  Though exempt under state law, some courts seem to include these exempt payment streams as income when making the calculations to arrive at a debtor's  disposable income.

Despite this jurisprudence, this Court does not believe it can force a debtor to remit exempt property for the benefit of claimants.  The Court rejects this approach because to hold otherwise would be to make exemptions meaningless.  If the exempt payment stream is designed to replace or supplement lost income, the better rationale may be to exclude the payment stream from income, but to factor its existence into a review of the debtor's scheduled, necessary expenses.  Technically this does not include the payment stream in income, but allocates some share of the burden of  living expenses to it.  This may be appropriate given the fact that these forms of exempt property are given in lieu of compensation or as a substitute for lost income.  Since the amount of necessary expenses will impact the disposable income test, the results may well be the same, though not in the way Trustee alleges.  Ultimately, the consideration may also boil down to a question of good faith.

---

[10]  The availability of exempt property to make accelerated plan payments or buy out other non-exempt assets would be impossible if liquidated proceeds constituted income, thereby raising the amounts due under the disposable income test of §1325(b).  In such an event, the use of exempt property proceeds could never constitute an accelerated payment or buy out of the non-exempt asset because the inclusion of the proceeds in the calculation of disposable income would automatically raise the amount necessary to complete a plan.

15

However, these are not the facts before the Court and therefore this issue is not decided by this opinion.

The exempt stream of payment cases are distinguishable from these facts.  While proceeds from the sale of non-exempt property are subject to the claims of creditors, exempt property retained at confirmation is different.  Not only is exempt property excluded from the calculation of the amounts required to be paid under a plan, a debtor can not be forced to distribute exempt property to claimants.  Exempt means exempt and therefore unavailable to either trustee or claimant. On its liquidation, therefore, the claimants have no right to expect or receive its benefits.  To hold otherwise would defeat the very purpose of our exemption laws by allowing a trustee to strong arm a debtor into giving up exemptions under a threat of objection to confirmation.

For the above stated reasons, I hold that Debtor is entitled to retain up to $25,000.00 of sale proceeds in recognition of the homestead exemption.  In so doing I adopt my reasoning  in *In re Dupre, case no. 03-14318* of this court's docket with regard to the applicability of the homestead exemption to sale proceeds as well as the discussion contained herein.

### III.  Debtor's Plan

The analysis now focuses on the request by Debtor to buyout the remaining payments due under his plan through a lump sum payment.  Debtor proposes to use the sale proceeds, over and above the homestead exemption, for this purpose.  The analysis of this request necessitates a consideration of the record of this case on confirmation.

At the time of confirmation, Debtor's only asset had a scheduled value of $30,000.00.  As a result, the net equity in that property, after consideration of the homestead exemption, was $5,000.00.

16

The liquidation value to creditors was something less given that on sale, a realtor's commission and trustees' fees would accrue.  Assuming a commission to a realtor equal to 6% of the sales price or $2,220.00,  and a trustee's commission of $1,950.00, little to no benefit would have accrued to creditors on liquidation.  Additional costs of sale might also have existed including closing costs, insurance and pro rated property taxes.

Thus at the time of confirmation, the liquidation value to claimants was certainly no more than $830.00.  Nevertheless, Debtor's disposable income calculation resulted in monthly payments of $134.00 and his plan provided a 54 month term.  This results in a gross total of $7,452.00 in payments over the life of the plan.  Debtor has made payments totaling $1,104.00 over the past six months.

Seven months after filing, Debtor's property is now being sold for a price of $37,000.00.  The Debtor has not claimed, as part of his fresh start, the value of any increase over that scheduled. Instead, Debtor is offering the entire net proceeds over and above the homestead exemption in full and final settlement of the amounts due under the plan.  Trustee has objected based on the fact that Debtor has made only 6 payments under his plan, and not all claimants have been paid in full. Therefore, Trustee believes Debtor's request violates 11 U.S.C. §§1329 and 1325(b).

Based on the liquidation value of his case, Debtor submitted a plan that endeavored to supply claimants with distributions equal to or exceeding the value of the non-exempt assets he retained. Though Debtor's liquidation value was $830.00, he provided a stream of payments to his creditors over 54 months with a gross value of $7,452.00.  Debtor has already made payments of $1,104.00 under this plan. Therefore the remaining payments  would have a gross value, without discount, of $6,348.00.  Debtor  now proposes to pay the full equity in the only non-exempt property he retained to Trustee, $12,000.00.  This sum exceeds the liquidation value accepted at confirmation or proven

17

today, as well as, the present value or gross aggregate value of payments due under the plan.

Nevertheless, Trustee asserts that because Debtor has not made 36 months of payments, he must continue to make payments under the plan until complete or creditors are paid 100%. Since the payments forwarded to date and under the sale will not fully satisfy creditors, Trustee reasons that additional sums are due. The Court finds that the pre-payment of Debtor's plan is in the best interests of creditors, in good faith, and that the pre-payment of a plan through a lump sum distribution does not violate the provisions of 11 U.S.C. §1329.

## A. An Accelerated Lump Sum Payment Does Not Violate §1329

There are many cases which discuss the merits of Debtor's request. The majority support the payment of a lump sum to complete a plan even when the Debtor has not previously made at least 36 months of payments. *See, In re Smith*, 237 B.R. 621 (Bankr.E.D.Tx.1999); *In re Sounakhene*, 249 B.R. 801 (Bankr.S.D.Ca..2000); *In re Murphy*, 327 B.R. 760 (Bankr.E.D.Va.2005); *In re Golek*, 308 B.R. 332 (Bankr.N.D.Ill.2004); *In re Richardson*, 283 B.R. 783 (Bankr.Kan.2002); *Massachusetts Housing Finance Agency v. Evora*, 255 B.R.336 ( D.C. Mass. 2000); *In re Bergolla*, 232 B.R. 515 (Bankr.S.D. Fla.1999); *In re Martin*, 232 B.R. 29 (Bankr.E.D.Mass.1999); *In re Casper*, 154 B.R. 243 (Bankr. N.D.Ill.1993); and *In re Moss*, 91 B.R. 563 (Bankr.C.D.Ca.1988). The reasons are varied.

One line of cases reasons that nothing in the Code prohibits the early payment of a debtor's obligations under a confirmed plan. These courts hold that a confirmed plan defines the obligations and rights of the parties. Since the early payment does not change the substantive terms of the plan, i.e. claimants receive exactly what was bargained for in the plan as confirmed, an acceleration is not a modification under §1329. Therefore, once all plan payments have been made, the debtor is entitled to a discharge under 11 U.S.C. §1328 regardless of when completion occurs. *See, In re Smith*, 237

18

B.R., 621 (Bankr.E.D.Tx.1999), *aff'd* 252 F.3d 1357 (5th Cir. 2001); *In re Murphy*, 327 B.R. 760

(Bankr.E.D.Va.2005)*; In re Bergolla*, 232 B.R. 515 (Bankr.S.D. Fa.1999); and *In re Casper*, 154

B.R. 243 (Bankr.N.D.Ill.1993)( Since §1329 only allows a modification before completion, once the

debtor tenders an amount sufficient to buyout the plan, a discharge is due).

Other courts hold that the accelerated payment of plan obligations is a modification of the

plan's terms. As such, the provisions of 11 U.S.C. §1329 must be satisfied. However, this does not

require the application of the disposable income test contained in §1325(b). Section 1329 adopts,

by specific reference, the application of §1325(a). Section 1325(a) provides, in relevant part, that the

plan (modification) must be proposed in good faith and must meet the best interests of creditors test.

Noticeably absent from §1325(a) are the provisions requiring the payment of disposable income for

36 months which are contained in §1325(b). As a result, these courts reason that a lump sum

payment in satisfaction of a confirmed plan, while a modification, is not prohibited by a strict reading

of §1329. *See, In re Sounakhene*, 249 B.R. 801 (Bankr.S.D.Ca.2000)*; In re Golek*, 308 B.R. 332

(Bankr.N.D.Ill.2004)*; In re Richardson*, 283 B.R. 783 (Bankr.Kan.2002); and *In re Moss*, 91 B.R.

563 (Bankr.C.D.Ca.1988) .

A minority of courts hold that the lump sum payment of the amounts due on a confirmed plan

is a modification which must satisfy both the provisions of §§1325 and 1329 in their entirety. These

jurists will not allow the early satisfaction of a plan through a lump sum payment unless the debtor

has paid a minimum of 36 months of disposable income into the plan. *See, In re Powers*, 140 B.R.

476 (Bankr.N.D. Ill.1992) *cf: In re Casper*, 154 B.R. 243 (Bankr.N.D.Ill.1993) and *In re Golek*, 308

B.R. 332 (Bankr.N.D. Ill.2004); *In re Nahat*, 315 B.R. 368 (Bankr.N.D.Tx.2004)(disposable income

test applies but may be satisfied if total payments, including accelerated payment, equal or exceed

36 months of disposable income, therefore not a bar to early completion); *In re Guentert*, 206 B.R.

19

958 (Bankr.W.D.Mo.1997). Thus, only two cases found, *Guentert, supra*, and *Powers, supra*, actually stand for the proposition that a plan may never be completed in less than 36 months if less than full payment of claimants is offered.

Our own Fifth Circuit appears to adopt the rationale of the first line of decisions. In *Bayshore National Bank of LaPorte v Smith*, 252 B.R. 107 (E.D.Tx.2000), *aff'd*, 252 F.3d 1357 (5th Cir. 2001), the debtor confirmed a plan which required payments over 54 months. Twenty-seven months into the plan, debtor's relatives offered to pay it out for a lump sum. The trustee took the funds, distributed them to creditors and filed a "Notice of Plan Completion." A creditor objected to the debtor's discharge because the debtor had not submitted 36 months of disposable income to creditors as required by §1325(b). The District Court disagreed. Citing §1328(a), the Court found that the debtor was entitled to a discharge as soon as practicable after completion by the debtor of all payments under the plan. Since there was no indication that the debtor operated in bad faith, the Court found that a discharge was warranted. The District Court was affirmed without opinion by the Fifth Circuit Court of Appeals. *See*, 252 F.3d 1357 (5th Cir. 2001).

Whether the request by this Debtor is a modification of his plan or not, the Court is satisfied that the  amounts offered are greater than the gross aggregate of 54 months of disposable income under his plan, exceed the liquidation value of his non-exempt assets as calculated at confirmation, or if appropriate, today. A strict interpretation of §1329 does not warrant that at least 36 months of payments must be made. On modification, courts must examine the substance of the plan and the nature of the debtor's obligations to the creditors. The crucial question is not whether the request affects the *number* of payments, but the *amount* to be paid. Therefore the provisions of §1325(b) are not applicable to this consideration, except as they may reflect on a debtor's good faith under §1325(a).

20

### B.  Good Faith Under §§1329 and 1325(a)

The aggregate value of the remaining plan payments in this case is approximately $6,348.00, payable over 30 months.  The present value of those payments is something less.  Trustee's position would have Debtor continue making payments over the next 30 months rather than accept a lump sum.  This position will actually result in a lower distribution to claimants due to the time value of money.  In addition, claimants would bear the risk of an intervening default.

A possible benefit to claimants, were this Court to require Debtor to remain in his case, would be the chance that Debtor's income would increase resulting in a corresponding increase in disposable income.  No evidence was offered on this point and the Court finds that a substantial increase in disposable income is unlikely.  Debtor is on a fixed income derived from Social Security.  While his benefits are subject to annual cost of living increases, those increases are tied to the inflation rate and therefore are likely to be accompanied by corresponding increases in necessary living expenses.  In addition, since Debtor owned his home outright, his present expenses do not include rent or mortgage payments. After the sale of his home,  these must also be calculated into any claim by Trustee for "disposable income."  Thus, it is more likely that Debtor's disposable income will decrease in the near future.

Another potential outcome from requiring Debtor to remain in chapter 13 and continue to make payments  might be the possibility that Debtor acquires new assets and therefore could increase distributions to claimants.  No evidence was offered by Trustee on this point either.  The Debtor is selling his only non-exempt asset to fund this buyout.  He has offered the entirety of the net proceeds after the satisfaction of his homestead exemption to claimants.  Though he might have argued that

21

its increase in value over that scheduled constitutes part of his fresh start, he has not requested that the appreciation of the property's value be retained. He is retaining no other non-exempt property and the Court has no reason to believe that any additional assets are anticipated.

It is also persuasive that Debtor could easily have moved to convert this case to one under Chapter 7 rather than seek an early buyout. Given that Debtor has no other non-exempt assets to protect, no mortgage to repay, no secured debt to reorganize, and no priority or nondischargeable debts, the sale of this property in chapter 7 would result in a distribution no greater than that produced by this request. In fact, the distribution might well be less because of additional administrative fees, professional time and effort. As a result, the cost to creditors and the system would increase. Such a vain and useless act can not be what was contemplated under the Code.

If the case were to be dismissed an even worse scenario might occur. In that event Debtor would retain all funds, and creditors would have to expend time and money in a race to the courthouse to seize the non-exempt portion of the sale proceeds. By the time they obtained a writ or judgment, nothing might be available. While Debtor would not get a discharge, in this case, his income is exempt from seizure, minimal in any event, and no non-exempt assets exist to protect. So the right to pursue Debtor into the future would be an exercise in futility.

Given that Debtor has minimal disposable income and that there is a risk that additional expenses are likely to accrue as well as accompany any increases in income, the Court believes that the risks associated with requiring Debtor to remain in his case are outweighed by any potential benefit. The Court takes judicial notice that the default rate among chapter 13 debtors in this district approaches 66%. To discourage the pre-payment of a plan is therefore counter intuitive. Barring some showing by Trustee that Debtor's proposed buyout is submitted in bad faith, it cannot be good

22

public policy to require a debtor to remain in a case when to do so would be counter to the best interests of creditors.

### C.  Calculation of The Buyout Amount

Trustee next argues that in calculating the total buyout value of Debtor's plan, Debtor should be required to remit the net proceeds of the sale of property and the aggregate total of 54 months of disposable income.  Trustee refers the Court to the Confirmation Order which requires the Debtor to turn over all proceeds from the sale of property for administration *and* pay 54 months of disposable income.  It is true that Debtor is voluntarily liquidating a non-exempt asset retained under the plan to satisfy his obligations.  However, I do not believe that the Confirmation Order requires  both the turnover of the proceeds *and* periodic payments over 54 months.

At confirmation, Debtor committed his disposable income to this plan.  He did so to preserve the very equity in the asset now liquidated.  As a result, Trustee's position would have Debtor pay twice for the same privilege of discharge, once through a distribution of the equity in the property and additionally through the payment of 54 months of disposable income.

The analysis of this issue may depend on what one believes the stream of payments under a plan represent.  Are they just objective amounts paid with no relationship to the assets retained?  Or is a plan a contract with claimants with underlying mutual benefit?  If one believes a plan to be a contract negotiated between debtor and creditors at mutual cost and benefit, then provided the terms of that contract are honored and good faith is present, the court should strive to give the parties what they  bargained for, no more and no less.

The confirmation of a plan is a contract between debtor and claimants.  As with any contract,

23

there are benefits or consideration to both sides.  There are also concessions.  Chapter 13 is a system

to allow debtors to retain non-exempt assets and pay claimants their value over time. The Bankruptcy

Code provides the minimum and maximum limits of the term and amount which must be paid in this

negotiation between the parties.  The upper limits of plan terms are designed to protect the debtor

from overreaching and extended servitude while the minimum limits are to protect creditors.  Very

often, the amounts paid under a plan are in excess of the value of the assets retained.  That may very

well be the concession given by the debtor for the privilege of paying out the liquidated value of non-

exempt property over time.   Conversely, creditors typically are required to take payments both over

time and in amounts less than the full value of their debts because Congress has decided that good

public policy dictates this result.  It is the balance of these rights and obligations, as well as the

desire to give effect to the terms of the contract negotiated between the parties, that is required.

Under these facts, Debtor is providing the full equity value of the only non-exempt asset

retained under the plan.  The distribution, when coupled with previous payments under the plan, will

result in almost the full payment of creditors.  If this buyout is confirmed, distributions under the plan

will total $13,104.00 on debts of $15,031.00.  Debtor's total net disposable income over the life of

the plan is only $7,452.00.  Therefore Debtor is both paying a sum greater than the liquidation value

of this asset (considering that realtor's fees have been eliminated) as well as a sum in excess of his

total disposable income over 54 months *without* discount.

To require Debtor to remit the equity in the property *and* his disposable income ignores the

purpose of the confirmation contract and what it afforded Debtor and his creditors.  Under the terms

of the plan, Creditors were entitled to receive $7,452.00 over time.  By allowing this sale, they

receive an additional $7,000.00 in unrealized value in the property *and* the bargained for liquidated

value of the asset.  Since on confirmation all property of the estate was vested in the Debtor, Trustee

24

could not require Debtor to liquidate this property.  Therefore, Debtor cannot be required to turnover

the funds obtained from a sale of property he retained under the plan without a credit against the

amounts due.          As at least one court has explained,

> Confirmation of the plan is the court's approval of a new contract with the debtor's
> pre-petition creditors limiting them to recovery of the remaining property of the
> estate-the debtor's projected disposable income designated by the plan for payment
> to prepetition creditors and any tangible property committed to the plan.
>                    *                    *                    *
> The law's original intent was that the debtor would pay creditors from projected
> disposable income and be allowed to retain other property.

*Richardson, supra*, at 800-801.[11]

As part of the deal a debtor makes with his or her creditors when electing to file under chapter

13, as opposed to chapter 7, the debtor retains all pre-petition property in exchange for committing

all post-petition disposable income to the payment of creditors under a plan of reorganization.  *In re*

*Burgie*, 239 B.R. 406 (9th Cir. BAP 1999); and *In re Golek, supra,* at 338.  If the debtor makes all

necessary payments pursuant to the plan, the debtor is permitted to keep all his pre-petition assets.

Because pre-petition property includes the proceeds received therefrom, the proceeds from a post-

petition sale of debtor's real estate are not post -petition income.  As such, neither the trustee, nor

anyone else could compel the debtor to use the proceeds to fund the plan.  *See also, In re Euler*, 251

B.R. 740 (Bankr.M.D.Fla.2000).

In this case, the facts are somewhat different as the Confirmation Order requires Debtor to

turnover the proceeds of any sale, post petition to Trustee "for administration."  Therefore under the

terms of the plan as confirmed, Debtor may be required to remit the proceeds received from the sale

of retained, non-exempt property to the Trustee, but upon doing so, Debtor is entitled to a credit

---

[11]  *See also, In re Murphy*, 327 B.R. 760 (Bkrptcy. E.D. Va. 2005)

against his obligations under the plan. To hold otherwise would be to ignore the very reason for the confirmation and the calculation of Debtor's obligations.

For the reasons stated, I find that the Debtor is both in good faith and that this proposal meets the best interests of creditors test. Therefore, upon the payment of the net proceeds received from the sale, after satisfying the payment of $25,000.00 to Debtor for the homestead exemption, and provided that the sum received is at least equal to or exceeds $6,348.00, Debtor's obligations under the plan will be concluded, and he will be entitled to a discharge. The Court will enter an appropriate Order.

New Orleans, Louisiana, February 22, 2006.

Elizabeth W. Magner
U.S. Bankruptcy Judge

26